IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **KEVIN & JOANNE GARDNER,** *Individually and on Behalf of Others Similarly Situated*, | * * | |
| Plaintiffs | * | |
| v. | * | CIVIL No. 1:10-cv-02781-JKB |
| **MONTGOMERY COUNTY TEACHERS FEDERAL CREDIT UNION,** | * * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

### In Re:  Defendant's Motion for Summary Judgment (ECF No. 39)
### Plaintiffs' Motion for Summary Judgment (ECF No. 40)

Kevin and Joanne Gardner ("Plaintiffs") brought this putative class-action suit against the Montgomery County Teachers Federal Credit Union ("Defendant") alleging violations of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA"), and the Maryland Consumer Protection Act, MD. CODE ANN., COM. LAW § 13-101, *et seq.* ("MCPA"). Now pending before the Court are cross-motions for summary judgment. The issues have been briefed and no oral argument is required. Local Rule 105.6. For the reasons explained below, Defendant's Motion for Summary Judgment (ECF No. 39) will be GRANTED IN PART (with respect to Counts III and IV of the Amended Complaint) and DENIED IN PART (with respect to Count I) and Plaintiffs' Cross-motion for Partial Summary Judgment (ECF No. 40) (with respect to Count I) will be GRANTED.

I. **BACKGROUND**

This case involves a dispute between a federally chartered credit union (Defendant) and two of its customers (Plaintiffs) over the legality of the credit union's practice of using funds from customers' checking and savings accounts to offset debt that the customers have incurred on their credit card accounts. Plaintiffs, Mr. and Mrs. Gardner, are Maryland consumers who maintain checking, savings, and credit card accounts with Defendant. On October 27, 2009, Defendant withdrew $145.00 from Plaintiffs' deposit accounts ($49.16 from their checking account and $95.84 from their savings account) in order to satisfy an amount due on their credit card account. Plaintiffs allege that Defendant made these withdrawals without their authorization. They further allege that it is Defendant's general practice, referred to as the Delinquent Loan Transfer Program ("DLT Program"), to use software to automatically withdraw funds from customers' deposit accounts to satisfy delinquent credit card balances.

On October 7, 2010, Plaintiffs filed a complaint in this Court alleging violations of the TILA and the MCPA and seeking declaratory and injunctive relief. (ECF No. 1). On June 7, 2011, they filed a motion to certify a plaintiff class consisting of "[a]ll persons who have had both a deposit account and credit card account with the Defendant in the three years preceding the filing of this complaint." (ECF No. 14-1). The Court, however, held the motion in abeyance and deferred the issue of class certification until any dispositive pre-trial motions on the substance of Plaintiffs' claims had been resolved.

On January 14, 2012, Defendant filed a motion for partial summary judgment with respect to Plaintiffs' claim under the MCPA. The Court granted the motion, finding that Plaintiffs had failed to allege any facts or advance any legal theories suggesting that Defendant had committed unfair or deceptive trade practices under that statute. (Memorandum, ECF No.

37).  Specifically, the Court rejected Plaintiffs' theory that a violation of the TILA was a *per se* violation of the MCPA.  In doing so, the Court also noted that, even if that theory were correct, Plaintiffs had not offered any evidence of a TILA violation either.  The Court therefore invited Defendant to file a second motion for summary judgment with respect to Plaintiffs' remaining claims.  (Order, ECF No. 38).  The Court set a briefing schedule, giving Defendant until March 9, 2012 to file its motion and giving Plaintiffs until March 19 to file a response.  The Court gave Defendant the option of filing a reply no later than March 26.

On March 9, 2012, Defendant filed its second motion for summary judgment (ECF No. 39) per the Court's order.  On March 26, Plaintiffs filed a response in opposition combined with their own cross-motion for partial summary judgment (ECF No. 40).  On April 18, the Court issued a letter order apprising the parties that it had reconsidered its previous position, expressed in *dicta*, that the evidence Plaintiffs had thus far adduced was insufficient to show a TILA violation.  Specifically, the Court observed that the law was unclear as to which party bore the burden of proof on the issue of whether Defendant had a valid security interest in the Plaintiffs' deposit funds, and speculated that the burden might be on Defendant to prove that it did have such an interest.  In view of this development, the Court gave each party until May 9, 2012 to file supplemental memoranda on the issue of the burden of proof, in addition to the normal course of responses and replies to the motions for summary judgment.  Defendant filed a supplemental memorandum on May 9, but Plaintiffs did not.  The Cross-motions for summary judgment are now ripe.

## II.     LEGAL STANDARD

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that he is "entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  If a

party carries this burden, then the court will award summary judgment unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. FED. R. CIV. P. 56(e)(2). To carry these respective burdens, each party must support its assertions by citing specific evidence from the record. FED. R. CIV. P. 56(c)(1)(A). The court will assess the merits of the motion, and any responses, viewing all facts and reasonable inferences in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

### III.   ANALYSIS

#### A.   Count I: Wrongful Offset

Count I of the Amended Complaint (ECF No. 24) alleges that Defendant seized funds from Plaintiffs' deposit accounts to offset their credit card debt without their authorization, in violation of TILA, 15 U.S.C. § 1666h and Regulation Z, 12 C.F.R. § 226.12(d), which read as follows:

**15 U.S.C. § 1666h**

A card issuer may not take any action to offset a cardholder's indebtedness arising in connection with a consumer credit transaction under the relevant credit card plan against funds of the cardholder held on deposit with the card issuer unless—

**(1)** such action was previously authorized in writing by the cardholder in accordance with a credit plan whereby the cardholder agrees periodically to pay debts incurred in his open end credit account by permitting the card issuer periodically to deduct all or a portion of such debt from the cardholder's deposit account …

**12 C.F.R. § 226.12(d)**

(d) Offsets by card issuer prohibited.

(1) A card issuer may not take any action, either before or after termination of credit card privileges, to offset a cardholder's indebtedness arising from a consumer credit transaction under the relevant credit card plan against funds of the cardholder held on deposit with the card issuer.

>(2) This paragraph does not alter or affect the right of a card issuer acting under state or federal law to do any of the following with regard to funds of a cardholder held on deposit with the card issuer if the same procedure is constitutionally available to creditors generally: Obtain or enforce a consensual security interest in the funds; attach or otherwise levy upon the funds; or obtain or enforce a court order relating to the funds.
>
>(3) This paragraph does not prohibit a plan, if authorized in writing by the cardholder, under which the card issuer may periodically deduct all or part of the cardholder's credit card debt from a deposit account held with the card issuer (subject to the limitations in § 226.13(d)(1)).

Plaintiffs base their right of action and request for actual damages on TILA's civil liability provision, which reads, in pertinent part:

**15 U.S.C. § 1640(a)**

>Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635 of this title, subsection (f) or (g) of section 1641 of this title, or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—
>
>>**(1)** any actual damage sustained by such person as a result of the failure;
>>
>>…

It is undisputed that Defendant used funds from Plaintiffs' deposit accounts to offset their indebtedness arising from a consumer credit transaction under a credit card plan.  Further, there are no allegations that the offset was affected by attachment, levy, or court order as described in § 226.12(d)(2), or by an automatic debit plan as described in § 226.12(d)(3).  The only question, then, is whether the offset was affected by "enforcing a consensual security interest in the funds" as described in § 226.12(d)(2).

The evidence on this issue is scant.  Neither side has been able to produce any documents signed by the Plaintiffs with respect to their credit card account, and Plaintiffs testified at their depositions that they do not remember what, if any, documents they signed.  (J. Gardner Dep.,

5

18:9-22:19, ECF No. 39-9, Ex. 8); (K. Gardner Dep. 17:18-20:1, ECF No. 39-12, Ex. 11).  The only direct evidence on the point is a sworn interrogatory answer in which Plaintiffs state that they were never provided with "any documents that conspicuously set forth any information relating to the defendant making any deduction of funds from their depository account for any credit card debt" or "any papers relating to any legal proceeding that gave the defendant the legal right to take the plaintiffs' property."  (Pl.s' Interrog. Ans. No. 5, ECF No. 39-3, Ex. 2); Defendants, however, have produced *an unsigned* application form, filled out with Plaintiffs' names and other identifying information (ECF No. 41-1, Ex. 1), which they claim is the document Plaintiffs signed, and which they further claim grants them a security interest in Plaintiffs' deposit accounts.

### 1. Burden of Proof

With such a dearth of evidence, the first and most critical issue that the Court must resolve is the allocation of the burden of proof.  In a previous memorandum (ECF No. 37) the Court stated in *dicta* that if Plaintiffs could not produce concrete evidence of the terms of their credit card agreement, then Defendant would be entitled to summary judgment on their TILA claim.  The Court subsequently withdrew that statement, noting that it was uncertain as to whether the borrower or the creditor bears the burden of proving compliance with TILA.  The Court offered both sides an opportunity to brief the issue.  Defendant submitted a memorandum (ECF No. 46) arguing that the Court was correct in the first instance to place the burden on Plaintiffs to prove that they did *not* give Defendant a security interest in their deposit accounts. Defendant noted that it was unable to locate any case law discussing burdens of proof specifically with respect to TILA's "no offset" rule.  Therefore, it argued, the standard civil litigation model applied to Plaintiffs' claim, meaning that they must prove each element by a

preponderance of the evidence. Defendant also cited two cases in which courts required plaintiffs to prove a creditor's non-compliance with other TILA and Regulation Z requirements. Plaintiffs argued, however, that any exceptions to Regulation Z's offset prohibition operate as affirmative defenses, which it is the defendant's burden to prove.

The Court's own research reveals that, as Defense Counsel writes in his memorandum, there is no clear rule either in the statute or in case law regarding a plaintiff's burden of proof specifically with respect to offsets. There is, however, extensive case law standing for the more general proposition that once a debtor makes a threshold showing that a TILA violation has occurred, then the burden shifts to the creditor to prove its compliance. *See, e.g., In re Cobb*, 122 B.R. 22, 26 (Bankr. E.D. Pa. 1990) ("[T]he burden of proving compliance with the TILA is upon a lender once a debtor has produced or provided some evidence or testimony that a TILA violation has occurred."); *In re Blakeney*, 126 B.R. 449, 459 (Bankr. E.D. Pa. 1991) (same); *Payne ex rel Estate of Payne v. Quicredit Corp. of America*, 71 F.App'x. 131, 134 (3rd Cir. 2003) (same); *In re Ross*, 338 B.R. 266, 271 (Bankr. E.D. Pa. 2006) (same); *In re Meyer*, 379 B.R. 529, 545 (Bankr. E.D. Pa. 2007) (same); *Wright v. Tower Loan of Mississippi, Inc.*, 679 F.2d 436, 444 (5th Cir. 1982) (stating that lender bears the burden of proving compliance with TILA and Regulation Z) (citing FRB Public Information Letter No. 832 (1974-1977 Transfer Binder) Consumer Cred. Guide-Special Releases (CCH) P 31,154 (Aug. 27, 1974)); *Hicks v. Star Imports, Inc.*, 5 F.App'x. 222, 227 (4th Cir. 2001) (same); *In re Williams*, 232 B.R. 629, 640 (Bankr. E.D. Pa. 1999) (same); *In re Maxwell*, 281 B.R. 101, 126 (Bankr. D. Mass. 2002) ("upon the submission of evidence that [TILA] disclosures were not made, the burden shifts to the lender to produce evidence that it or its predecessor provided the requisite disclosures.").

Defendant, however, argues that a (nominally) different rule applies, *i.e.*, that "plaintiffs typically bear the burden of proof of demonstrating a violation of TILA by a preponderance of

the evidence." (Supp. Mem. 5, ECF No. 46). But, Defendant cites only two cases in support of this position, and neither of these are particularly probative of the issue. In both cases – *Smith v. Argent Mortgage Company, LLC*, Civil Case No. 05-cv-02364-REB-BNB, 2007 WL 4105192 (D. Colo. Nov. 14, 2007) and *Stutzka v. Walters*, No. 8:02CV72, 2006 WL 1215146 (D. Neb. April 28, 2006) – the borrowers alleged that the lenders had failed to provide them with certain documents required by TILA. Both courts, however, found that the evidence before them showed that the lenders *had* provided the documents and that the borrowers therefore had not carried their burden of proving a TILA violation by a preponderance of the evidence. Although these opinions are written in terms of the borrowers' burdens of proof, that is not necessarily inconsistent with the burden-shifting framework described above. What the courts in these cases actually found was that there was affirmative evidence of the lenders' compliance with TILA that outweighed the borrowers' evidence of non-compliance. Clearly, where a lender offers persuasive evidence that it has complied with TILA, a borrower must prove that a violation occurred in order to prevail on his claim. But, this does not address the issue of what a borrower must show in the first instance, before the lender has offered any evidence of compliance.[1]

The Court, therefore, finds that the general rule in TILA cases is that once a debtor makes a threshold showing of a violation, the burden of proof shifts to the creditor to prove its compliance. That rule, however, offers little guidance in this case because the real question at issue here is whether Defendant's purported security interest (or lack of it) is an element of Plaintiffs' claim, or an affirmative defense *to* it. For the following reasons, the Court finds that it is the latter.

Defendant's position, that the absence of a security interest is an element of Plaintiffs' claim that they must prove, is based on its argument that "Neither TILA nor Regulation Z … contain a

---

[1] But, to the extent that the cases can be read to suggest that the question of compliance with TILA will be resolved against the debtor where the debtor makes a threshold showing of non-compliance and the creditor offers no evidence at all, or where the evidence of compliance and non-compliance is equally matched, then the Court respectfully finds that they are against the overwhelming weight of authority.

blanket prohibition against offsetting indebtedness of a credit card holder against funds held on deposit with the issuer of the credit card," and that, instead, "Section 226.12(d) effectively provides that the credit card issuer can conduct such offsets as long as, among other possibilities, it has a consensual security interest in the funds." (Supp. Mem. at 4). The Court, however, finds that this reading of the Regulation is mistaken. Indeed, a "blanket prohibition" on offsets is precisely what § 226.12(d) describes. The title of subsection (d) is "Offsets by card issuer prohibited," and Paragraph (1) states in plain terms that "[a] card issuer may not take any action … to offset a cardholder's indebtedness … against funds of the cardholder held on deposit with the card issuer."

      The root of Defendant's error is its apparent assumption that: (1) "offset" is a generic term for satisfying a debt with property of the debtor not intended for that purpose; and (2) that the mechanisms for gaining access to a borrower's deposit funds listed in § 226.12(d)(2), including the enforcement of a security interest, are merely different methods of offsetting one debt against another. Neither is the case. Rather, "offsets" and "security interests" are specific and distinct legal concepts. *See, e.g., In re Quisenberry*, 295 B.R. 855, 858 (Bankr. N.D. Tex. 2003) ("the right to setoff is not the equivalent of a security interest or lien."). The common law right of offset (or "setoff") "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat. Bank*, 229 U.S. 523, 528 (1913)) (internal quotation marks omitted). Funds on deposit with a bank are, strictly speaking, debts owed by the bank to the depositor, the money itself being the property of the bank.[2] Thus, when a bank both holds a customer's funds on deposit and lends him money, the bank and the customer become mutual debtors. Therefore, at common law, banks are entitled to offset a debtor's defaulted loan

---

[2] "The general rule is that the relation between a general depositor and the bank in which his deposit is made is simply that of debtor and creditor. The moneys deposited immediately become the property of the bank, and the latter becomes debtor of the depositor." *Federal Ins. Co. v. Smith*, 63 F.App'x. 630, 639 n.2 (4th Cir. 2003) (quoting *Bernardini v. Cent. Nat'l Bank of Richmond*, 223 Va. 519, 290 S.E. 863, 864 (1982)) (internal quotation marks omitted).

against funds in his deposit account. *See id.; Bandy v. First State Bank, Overton, Tex.*, 835 S.W.2d 609 (Tex. 1992).[3] Regulation Z extinguishes this right with respect to credit card issuers. But, the right of offset is not the only means by which a bank can lawfully gain access to its customer's deposit funds and use them to satisfy a debt that he owes. Other rights and remedies traditionally available to creditors in the event of a borrower's default – attachment, court order, security interest – can be exercised to the same effect.

Contrary to Defendant's assertion, § 226.12(d)(2) does not prescribe these rights as acceptable means of effecting an offset, but, rather, clarifies that they are not "altered" or "affected" by the offset prohibition. Whether a card issuer has lawfully acquired a debtor's deposit funds through one of these rights is thus primarily a matter of the substantive state or federal law that creates them, not of TILA or Regulation Z.[4] Thus, since these rights do not form any part of the substance of § 226.12(d), they cannot be a required element of a plaintiff's claim for wrongful offset. Rather, a plaintiff is only required to show that a card-issuer has taken his deposit funds and used them to satisfy his credit card debt. That is, *prima facie*, an offset. The card-issuer will not be held liable, however, if it can point to some independent source of its entitlement to the deposit funds (*i.e.*, other than a general right of offset). Such an entitlement thus fits the definition of an affirmative defense, *i.e.*, "[a] defendant's assertion of facts and arguments that, if true, will defeat the

---

[3] "A bank's right of setoff is … ancient, stemming from the banker's lien of the law merchant. The theory behind the banker's lien is that a bank has a lien on all of a customer's property that is in the bank's possession for the amount due the bank from the customer in the ordinary course of business. The banker's lien has been widely accepted in other jurisdictions and has been recognized by at least one Texas court." *Id*. at 618-619 (internal citations omitted).

"The bank's right in situations such as this is more appropriately called a setoff than a lien. A debtor/creditor relationship is created when a customer opens a general depository account with a bank. Such a bank account constitutes a debt where the bank is the debtor and the customer is the creditor. When the customer also owes the bank money, such as through a promissory note, the bank is the creditor of the customer. It is this mutual debtor/creditor relationship, which occurs when a depositor also borrows money from the bank, that gives rise to the bank's right of setoff." *Id*.

[4] Although the Federal Reserve Board's Official Staff Commentary states that a card-issuer must follow certain procedures to obtain a security interest that will not be considered the "functional equivalent of a right of offset," this does not imply that Regulation Z is the source of the card-issuer's right to obtain or enforce the interest in the first place. Rather, it is a special additional burden that Regulation Z places on the exercise of a pre-existing right in the specific context of open-end credit transactions.

plaintiff's or prosecution's claim, even if all the allegations in the complaint are true." *U.S. v. Stevens*, 771 F.Supp.2d 556, 565 (D. Md. 2011) (citing Black's Law Dictionary 482 (9th ed. 2009)).  The burden of proving an affirmative defense rests with the defendant; the plaintiff is not obligated to disprove or otherwise anticipate the defense in order to maintain an action. *See Rux v. Republic of Sudan*, 461 F.3d 461, 468 n.2 (4th Cir. 2006) (discussing burden in context of sovereign immunity defense) (citation omitted).  For these reasons, the Court holds that it is the Defendant's burden to prove that it held a consensual security interest in Plaintiffs' deposit funds.

## 2. Defendant's Security Interest

Although Defendant does not concede that it must prove its security interest to avoid liability in this case, it nevertheless argues that it has done so.  First, Defendant points to an unsigned loan application form that it produced during discovery that has been filled out with Plaintiffs' names and information. (Loan Application, ECF No. 41-1, Ex. 1).  When Defense Counsel showed Plaintiffs the unsigned application at their depositions, neither one could recall signing it.  Nevertheless, Defendant argues that since "[t]he Gardners were, in fact, issued a credit card … it is reasonable to assume that [they] did sign the Loan Application."  (Def.'s Reply at 7, ECF No. 41).  Defendant then points to language in the loan application that reads: "by signing below, using, or permitting another to use the credit card(s), you agree that you will be bound by the VISA agreement accompanying the credit card(s)."  Defendant then states that its practice is to send "disclosures" to its members when they are first granted a credit card account and to then send updated disclosures annually thereafter. *Id*.  Defendant claims that provisions granting it a security agreement in the borrower's deposit accounts appear in two different sets of disclosures. The first is what appears to be a pamphlet or booklet entitled "Account Information," a copy of

which Defendant claims was produced by Plaintiffs during discovery.  The following language appears on page 8 of the Account Information booklet:

> Unless prohibited by law, you pledge and grant as security for all obligations you may have now or in the future, except obligations secured by your principal residence, all shares and dividends and all deposits and interests, in any, in [sic] all accounts you have with us now and in the future. If you pledge a specific dollar amount in your account for a loan, we will freeze the funds in your account(s) to the extent of the outstanding balance of the loan or, if greater, the amount of the pledge if the loan is a revolving loan. Otherwise, funds in your pledged account(s) may be withdrawn unless you are in default. Federal law gives us a lien on all shares and dividends and all deposits and interest, if any, in accounts you have with us now and in the future. Except as limited by state or federal law, the statutory lien gives us the right to apply the balance of all your accounts to any obligation on which you are in default. After you are in default, we may exercise our statutory lien rights without further notice to you.
>
> **Your pledge and our statutory lien rights will allow us to apply the funds in your account to what you owe when you are in default, except as limited by state or federal law.** If we do not apply the funds in your account(s) to satisfy your obligation, we may place an administrative freeze on your account(s) in order to protect our statutory lien rights and may apply the funds in your account(s) to the amount you owe us at a later time. The statutory lien and your pledge do not apply to any Individual Retirement Account or any other account that would lose special tax treatment under state or federal law if given as security. By not enforcing our right to apply funds in your account to your obligations that are in default, we do not waive our right to enforce those rights at a later time.

(Account Information Booklet, p. 8 ¶ 20, ECF No. 41-5, Ex. 5).  The second set of disclosures is a two-page document entitled "Credit Card Agreement and Disclosure: Share VISA-Student VISA-Classic VISA-Gold VISA-Platinum VISA."  The Court infers, although Defendant does not specifically say, that this is the "VISA Agreement" referenced in the unsigned loan application.  Paragraph 9 of the Agreement reads:

> **9. Default.** You will be in default if you fail to make any Minimum Payment within 6 days after the payment due date or the last day of the month, whichever is first and a late fee will be assessed.* You will also be in default if your ability to pay us is materially reduced by a change in employment, an Increase in your obligations, bankruptcy or Insolvency proceedings Involving you, your death or your failure to abide by this agreement, or if the value of your security interest materially declines.  We have the right to demand immediate payment of your full account balance if you default, subject to our giving you any notice required by

law. To the extent permitted by law, you will also be required to pay our collection expenses, including court costs and reasonable attorney's fees.

(VISA Agreement ¶ 9, ECF No. 41-6, Ex. 6).

To determine whether these documents evidence a consensual security interest in Plaintiffs' deposit funds, as contemplated by Regulation Z, the Court will consult the Federal Reserve Board's Official Staff Commentary on § 226.12(d), which explains in clear terms what is required:

> Paragraph 12(d)(2).
>
> 1. Security interest--limitations. In order to qualify for the exception stated in § 226.12(d)(2), a security interest must be affirmatively agreed to by the consumer and must be disclosed in the issuer's account-opening disclosures under § 226.6. The security interest must not be the functional equivalent of a right of offset; as a result, routinely including in agreements contract language indicating that consumers are giving a security interest in any deposit accounts maintained with the issuer does not result in a security interest that falls within the exception in § 226.12(d)(2). For a security interest to qualify for the exception under § 226.12(d)(2) the following conditions must be met:
>
> i. The consumer must be aware that granting a security interest is a condition for the credit card account (or for more favorable account terms) and must specifically intend to grant a security interest in a deposit account. Indicia of the consumer's awareness and intent include at least one of the following (or a substantially similar procedure that evidences the consumer's awareness and intent):
>
> A. Separate signature or initials on the agreement indicating that a security interest is being given.
>
> B. Placement of the security agreement on a separate page, or otherwise separating the security interest provisions from other contract and disclosure provisions.
>
> C. Reference to a specific amount of deposited funds or to a specific deposit account number.

Applying these standards, the Court finds that the documents on which Defendant relies for its purported security interest in Plaintiffs' deposit funds are plainly inadequate. First, the

default provision of the VISA Agreement says absolutely nothing about granting Defendant a security interest in a borrower's deposit accounts. Any suggestion that this provision effects such an interest is patently frivolous. Second, with respect to paragraph 20 of the Account Information booklet, none of the indicia of intent listed in the Staff Commentary, or anything remotely equivalent to them, are present. Far from having a separate signature or initials next to the security interest provision, there is no place anywhere in the entire document for the borrower to sign or write his initials. Rather than being set apart from the rest of the document, the security interest provision is buried on the eighth of twenty pages of fine print.[5] And, rather than referring to a specific account number or dollar amount, the provision simply refers to "any" and "all" accounts with Defendant. Further, given Defendant's statement that it provides borrowers with these disclosures only *after* they have been granted a credit card account, it is difficult to see how a card-holder would understand that granting Defendant the security interest was a condition of his getting the account in the first place. Clearly, then, this is precisely the kind of "routine" security interest provision, "the functional equivalent of a right of offset," that the Staff Commentary expressly prohibits.

For these reasons, the Court finds that there is no genuine dispute of material fact with respect to Defendant's purported security interest in Plaintiffs' deposit funds. It had none. Therefore, since it is undisputed that Defendant took funds from Plaintiffs' deposit accounts to offset their credit card debt, and since Defendant has not shown that it acquired the funds by any means other than a general right of offset, summary judgment will be entered in favor of Plaintiffs and against Defendant on Plaintiffs' claim under TILA, 15 U.S.C. § 1666h and

---

[5] Although the first sentence of the second paragraph quoted above is set in bold, in the copy submitted to the court the difference is barely visible.

Regulation Z, 12 C.F.R. § 226.12(d) in the amount of Plaintiffs' claimed actual damages of $145.00.[6]

### B. Declaratory and Injunctive Relief

Counts III and IV of the Amended Complaint (ECF No. 24) seek declaratory and injunctive relief, respectively. Defendant argued in its summary judgment motion that Plaintiffs are not entitled to these remedies, but Plaintiffs have not responded to these arguments. Rather, Plaintiffs' cross-motion seeks summary judgment only as to Count I. (Pl.'s M.S.J. at 14, ECF No. 40-17). It therefore appears that Plaintiffs have abandoned these claims for relief. Even if they had not, however, Defendant would be entitled to summary judgment.

The standing requirements for declaratory relief and injunctive relief are essentially the same. *Levinson-Roth v. Parries*, 872 F.Supp. 1439, 1446 (D. Md. 1995). A plaintiff who seeks either form of relief must show that he is in danger of being injured by the opposing party's conduct and that the danger is both "real" and "imminent" and neither "conjectural" nor "hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Importantly, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy." *Id.* (internal quotation marks and citation omitted). Here, the complaint requests a declaratory judgment "as to whether the Defendant has the right to make withdrawals from deposit accounts for credit card debt," (Am. Compl. ¶¶ 66, 68), and asks that "[t]he Defendant … be enjoined from making illegal withdrawals from deposit accounts for credit card debts." (Am. Compl. ¶ 72). But, Plaintiffs have offered no facts at all suggesting that Defendant is poised to withdraw more money from their accounts or from the accounts of any putative class member. Indeed, Plaintiffs

---

[6] Defendant argues that Plaintiffs' motion for summary judgment should be denied because it was not timely filed. Although it does appear that the motion was filed out of time, the point is moot. If the Court were to disregard Plaintiffs' motion and consider only Defendant's motion for summary judgment, that motion would be denied and the case would then have to proceed to trial. The record reveals, however, that there are no triable issues of material fact. The Court cannot allow a case to go to trial when there is nothing to try.

acknowledge that Defendant has suspended the DLT Program pending the outcome of this litigation.  Plaintiffs therefore lack standing to seek an injunction or declaratory judgment, and Defendant is entitled to summary judgment on those claims for relief.

## IV.     CONCLUSION

Accordingly, an order shall enter GRANTING IN PART and DENYING IN PART Defendant's Motion for Summary Judgment (ECF No. 39) and GRANTING IN PART and DENYING IN PART Plaintiffs' Motion for Summary Judgment (ECF No. 40).

Dated this 4th day of June, 2012

BY THE COURT:

/s/
James K. Bredar
United States District Judge